**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALESSANDRO GODEAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FMC CORPORATION, PIERRE R. BRONDEAU, and ANDREW D. SANDIFER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Alessandro Godeas ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by FMC Corporation ("FMC" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of FMC public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired FMC common stock between February 4, 2026, to October 14, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning FMC's expected financial outlook for 2026, including its projected revenue, adjusted EBITDA and free cash flow, as well as growth expectations through increased sales volumes, new products and lower operating costs. Defendants' statements included, among other things, confidence in FMC's ability to drive growth through new product introductions, volume growth and manufacturing cost reductions, while navigating competitive pricing pressures affecting its Rynaxypyr and legacy product portfolios.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of FMC's distributor-inventory problem, including the extent to which elevated-priced inventory held by distributors was difficult to sell thereby impairing replenishment orders across FMC's portfolio and threatening the Company's ability to generate new sales, revenue, EBITDA and cash flow. Such statements absent these material facts caused Plaintiff and other shareholders to purchase FMC's securities at artificially inflated prices.

4. The truth emerged after the market closed on October 14, 2026 when FMC announced preliminary third quarter 2026 results materially below expectations and sharply reduced its revenue and adjusted EBITDA for the quarter.

5. Investors and analysts reacted immediately to FMC's revelation. The price of FMC's common stock declined from a closing market price of $8.09 per share on October 14, 2026, FMC's stock price fell to $5.62 per share on October 15, 2026, a decline of about 31%.

## JURISDICTION AND VENUE

6. Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant FMC's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11. Plaintiff purchased FMC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in FMC is attached hereto.

12. FMC Corporation is a Pennsylvania corporation with its principal executive offices located at One Michael Owens Way, Perrysburg, Ohio 43551. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "FMC."

13. Defendant Pierre R. Brondeau ("Brondeau") was, at all relevant times, the Chairman of the Board and Chief Executive Officer of FMC.

14. Defendant Andrew D. Sandifer ("Sandifer") was, at all relevant times, the Executive Vice President and Chief Financial Officer Executive of FMC.

15. Defendants Brondeau and Sandifer are sometimes referred to herein as the "Individual Defendants." FMC together with the Individual Defendants are referred to herein as the "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FMC's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. FMC is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to FMC under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19. FMC Corporation is an agricultural sciences company, develops, markets, and sells crop protection chemicals in Latin America, North America, Europe, the Middle East, Africa, and Asia. It markets its products through its sales organization and alliance partners, independent distributors, and sales representatives.

### *The Defendants Materially Misled Investors Concerning FMC's 2026 Financial Outlook*

*February 4, 2026*

20. On February 4, 2026, FMC announced fourth quarter 2025 and full year results, and provided the Company's 2026 outlook, projecting revenue of $3.60 billion to $3.80 billion and adjusted EBITDA of $670 million to $730 million. Management acknowledged expected pricing pressure, including the impact of Rynaxypyr's post-patent strategy, but still projected a year of continued business performance and operational improvement. As part of the press release, Defendant CEO Pierre Brondeau stated, "[o]ur focus in 2026 is on executing our operational priorities, which include strengthening the balance sheet and improving the overall competitiveness of our portfolio."

21. During the accompanying earnings call held on February 5, 2026, Defendant Brondeau acknowledged that manufacturing constraints would reduce sales flexibility in 2026,

creating a sales headwind that was already incorporated into its forward guidance. In pertinent part, he highlighted the Company's positive developments and presented FMC's 2026 financial outlook as follows:

> ***In addition, we are in active discussions regarding licensing agreements, which include upfront payments. Increasing the competitiveness of our off-patent portfolio product remains a top priority. Our goal is to lower the cost of non-diamide products to more effectively compete against generics.*** 2025 sales of this core product, excluding Rynaxypyr, were approximately $2.2 billion. Nearly $1 billion of these sales came from products manufactured in high-cost facilities. We expect to lower the manufacturing cost of these products by at least 35% by 2027. This is a complex process, which will require a re-registration for most products as well as a buildup of inventory in advance of the transition.
>
> * * *
>
> ***Beginning 2026, there will be generic offerings of CTPR in all markets. As CTPR becomes more widely available through generics, resistance is likely to increase.***
>
> * * *
>
> We estimate 2026 sales for new active ingredients to be between $300 million and $400 million. These actives are in high demand with 3 of them offering a new mode of action. We still expect sales of the 4 actives to exceed $2 billion by 2035. We believe executing these priorities position us to enter 2027 with a stronger balance sheet, a more competitive portfolio and growing sales of higher-margin differentiated products.
>
> Our 2026 full year guidance is provided on Slide 5. ***We're expecting full year sales of $3.6 billion to $3.8 billion to be down 5% at the midpoint versus prior year. Price is expected to be a mid-single-digit headwind driven by Rynaxypyr, which is consistent with our post-patent strategy.*** The removal of India is expected to be a 2% full year headwind that will only impact the first half. Excluding India, we expect volume to be modestly higher, driven by new actives and branded Rynaxypyr. Full year adjusted EBITDA is expected to be between $670 million to $730 million.

(Emphasis added).

22. On the same call, Defendant Sandifer highlighted favorable manufacturing costs, higher volumes and positive contributions from new active ingredients in 2026, while emphasizing FMC's plan to reduce debt by $1 billion through asset sales and licensing agreements, stating in relevant part:

> ***We ended the fourth quarter with net debt of approximately $3.5 billion, down over $550 million from the third quarter due to strong free cash flow.***
>
> * * *
>
> Free cash flow for 2026 is expected to be in the range of negative $65 million to positive $65 million or breakeven at the midpoint, including an expected $130 million in restructuring spending. Lower EBITDA, higher restructuring spending and modestly higher capital expense are expected to be offset by the liquidation of India working capital, lower cash taxes and improved working capital performance in the ongoing business.
>
> ***Despite breakeven free cash flow and lower EBITDA, with the successful execution of our debt paydown plan, we expect to end 2026 with a reduction in net leverage of approximately 0.5 turn.*** We would then expect leverage to further improve in subsequent years with higher free cash flow from growing EBITDA and reduced restructuring spending.

(Emphasis added).

23. During the question-and-answer segment of the call, Defendants acknowledged generic competition across FMC's core portfolio but expressed confidence in branded Rynaxypry and growth-product performance, while noting they had underestimated the severity of generic competition in the following pertinent exchanges:

> <Q: Lucas Charles Beaumont – UBS Investment Bank – Analyst> So I mean I know you guys talk about the sales a lot, but there's been a lot of volatility in there with the pricing and the earnings outlook. So I mean, anything you kind of share to help sort of understand the components would be great.
>
> <A: Andrew D. Sandifer> [W]e're expecting the branded Rynaxypyr business to deliver earnings that are essentially flat year-on-year. ***We do see a decline in the partner sales portion of the Rynaxypyr business, both in price as our continued efforts to improve cost for Rynaxypyr are shared with our partners through the cost plus pricing contract mechanism as well as lower volumes. For the rest of the portfolio, we will see increasing contribution from the growth portfolio from all 3 elements of the growth portfolio***, both at sales and in profitability with contributions from Cyazypyr, certainly from the new AI as we have meaningful growth from the year before and from Plant Health.
>
> <A: Pierre R. Brondeau> Just to answer at a high level around the volatility and our level of confidence, ***I think we have very high level of confidence in our total growth portfolio. The 4 new actives, Plant Health, Cyazypyr. We also have a high level of confidence in our ability to keep earnings flat from 25% for branded Rynaxypyr and we're already seeing how this is going to be deployed.***

. . .
<Q: Joel Jackson – BMO Capital Markets – MD & Senior Analyst> I'm looking also, of course, of the good nuance guidance you gave last year for all the product buckets going out for a few years. So if I understand, I mean, you said what you think the new AIs will do in the growth portfolio in '26, but there's some other product buckets.

<A: Andrew D. Sandifer> When we think about the sort of the core versus the growth portfolio and big strokes for revenue, for Rynaxypyr, as Pierre mentioned, we're expecting flat earnings from the branded business. Revenue could be slightly down, but it's not a tremendous difference. Where you have the shrink year-on-year in the Rynaxypyr business is in partner sales. That's both from price, from the cost-plus pricing mechanism and from volume with the partners.

For our legacy core, all the remaining core products, we are expecting a slight contraction drop year-on-year. That's pricing and volume, right? So overall, the core portfolio is down year-on-year from '26 versus '25.

***When we look at the growth portfolio, we have growth in all aspects of the growth portfolio led by the 4 new active ingredients that are growing strongly, right…So all 3 pieces of the core portfolio are growing in '26, but it's really differentially impacted by the new active ingredients.***

<A: Pierre R. Brondeau> ***Rynaxypyr, the strategy is focused on earnings and we do expect branded Rynaxypyr earnings to be flat versus '25. And then where we have a contraction it's in partner sales for Rynaxypyr and the core portfolio.***
. . .
<Q: Edlain S. Rodriguez – Mizhuho Securities USA LLC, Research – Director> Like how confident are you that you have a good sense of the challenges facing the company? Because, again, things keep popping up here and there.

<A: Pierre R. Brondeau> I'm going to answer that in a very, very straight manner. I think we've done a lot since I've been back in the company. ***There is one part which I missed. It is the risk we had to see a core portfolio outside of Rynaxypyr being as challenged as it's been by generic.***

And if you look at the performance of the company, we pretty much performed as expected in every aspect, except the core portfolio outside of Rynaxypyr. The problem is that it's a big part of the company. It's $2.2 billion. ***So just shrinking on this part of the company by 3%, 4% is a significant impact. I was not anticipating that the downturn would last that long and that there will be that amount of competitiveness in that part of our portfolio especially in place like Latin America.***

***I would have to do it again. I will have started the restructuring of manufacturing footprint earlier. It is what it is, but if you look today at the portfolio of the***

> ***company, the entire growth portfolio, the 3 parts are in great shape and performing exactly as we are expecting. The Rynaxypyr branded strategy is clearly in place. We have one thing to fix. It's the core portfolio. We know how to do it. It's ongoing. The plan is in place and is started.***
>
> So why am I so confident? ***It's because the number of things we have to fix is limited. It's one thing. The rest, it's in place. The problem, this thing, we have to fix, we better fix it because it's big, but it's not that complicated to know what we have to do.***
>
> . . .
>
> <Q: Salvator Tiano – Bank of America Securities – Analyst> Number one, based on the flow chart, you mentioned that the EBITDA decline this year on Rynaxypyr will be from your partner sales…So that implies a massive, massive reduction in margin. So are these numbers correct? And why are the earnings on that small bucket declining as much?
>
> <A: Andrew D. Sandifer> [F]or Rynaxypyr in particular, as we think about the partner sales, we're looking at a reduction in volume and price. ***So certainly, volume and price or impacts on the partner sales for Rynaxypyr and reduced both sales and profitability year-on-year for that piece of business. For the branded Rynaxypyr business, we have a combination of factors at play. We are reducing price, particularly on less differentiated Solo formulations that directly compete with low-cost generic entrants.***

(Emphasis added).

*<u>February 25, 2026</u>*

24. On February 25, 2026, Defendants presented at the Bank of America 2026 Global Agriculture and Materials Conference. During the question-and-answer portion of the conference, Defendants touted plans to restore the Company's core portfolio through manufacturing cost reductions and restructuring initiatives in the following exchanges:

> <Q: Matthew Porter DeYoe – Bank of America Securities – Research Analyst> Are there specific portions that are just being hit particularly hard that you can address? Or is this -- that core business is all kind of unilaterally under pressure across all your modes of action and products?
>
> <A: Pierre R. Brondeau> The latter. I think what's been happening is, over the last 3 years, because of the prolonged downturn, the low demand price have been going down constantly. Generics have been very active in pushing price down. And I must admit something. ***I realized maybe a few quarters too late that our portfolio, our core portfolio was getting uncompetitive from a price standpoint because our cost***

***was too high.*** Half of it is produced in high-cost plants, and even the one we are producing or procuring in low-cost regions could be done at lower cost.

So we have redefined a process to relook at our footprint and bring back manufacturing cost in a place where with a straight molecule or with formulation, we can compete with any generics around the world.

. . .

<Q: Matthew Porter DeYoe – Bank of America Securities – Research Analyst> First is as you look at where you're priced. Have you basically priced back on top of the market? So if I were to see, if we were to diligence in commodity crop chemical prices rise 5%, will your core portfolio also be up 5% now? Is it -- are you kind of on top of market prices and competing where the market is now?

<A: Pierre R. Brondeau> We try to be where the market is. The problem is in the deflationary market when price is going down. If you look at our results over the last few quarters, ***what we have lost is volume because there were cases where price were going down to a place where it didn't make sense for us to stay with the market price. So most of the time, when you look at volume loss at FMC, it's on core products. And if you look in 2026, that is the number one driver of a lower EBITDA versus 2025, it's same thing. We're not going to be able to go after all of the business on the core because of the manufacturing cost.***

. . .

<Q: Matthew Porter DeYoe – Bank of America Securities – Research Analyst> And so you talked about operating costs associated with $1 billion in revenue being down 35%, I think, it's the target. How do you get there? So what actions are you taking? And I mean, is this like $300 million in savings? Is that kind of the rough number we're looking at?

<A: Pierre R. Brondeau> Not exactly. It's saving 35% of the manufacturing cost, $1 billion is the selling price. ***So if manufacturing cost is 50%, it's 35% -- $150 million, $170 million.*** But there is 2 aspects of it. ***One of the cost reduction is going to be made by moving out of manufacturing of active ingredients in Europe and North America, and move all of this to lower cost country, India and China***, either in our India and China plants or with our total manufacturing partners, very often exclusive or through contract supplies with generics, who are working with us. ***So that's the way we're going to do it. So we're going to limit our operations in Europe to more formulations and manufacturing of active ingredients and refocus all of the manufacturing to India and China.***

. . .

<Q: Matthew Porter DeYoe – Bank of America Securities – Research Analyst> So the restructuring work this year is consuming cash. Next year, if we return to growth, typically, that's a working capital headwind. How do we chart -- if the company is going to grow 15% in '26 and 15% in '27. How do we chart the cash flow progress from here?

<A: Andrew D. Sandifer> I think if you look starting at '26, ***we've guided to a midpoint of essentially breakeven free cash flow.*** Now embedded in that is about $130 million of cash restructuring spend for both the manufacturing footprint changes, Pierre was just talking about as well as for some final costs in the next -- over the next couple of years from a large take-or-pay supply agreement in our Rynaxypyr that we walked away from 2 years ago.

***So what I think you'll see is you'll start seeing pretty healthy EBITDA growth after the repositioning in '26.*** We've said openly mid-teens, 15% kind of range in '26, '26 into '27 and '27 into '28. As you get that higher level of EBITDA, more of that will flow down to free cash flow. By '28, certainly, there's a much less drag from restructuring expenses. There will be a pretty significant step down from '27 to '28 with the restructuring expenses.

(Emphasis added).

*March 18, 2026*

25. On March 18, 2026, Defendants presented at the JP Morgan 2026 Industrials Conference. During the question-and-answer portion of the conference, Defendants reiterated that lower manufacturing costs and increased sales volume would lead to flat year-over-year Rynaxypyr earnings in the following exchanges:

<Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> What's been your experience of the growth of the Rynaxypyr and Cyazypyr in volume terms in 2024 and '25.

<A: Pierre R. Brondeau> I think in 2024 and 2025, ***we started to see a slowdown of the growth of those molecules because we started to see generics penetrating some market.*** Market like India, of course, like China, Asia, Turkey, some markets in Latin America. So we had a slowdown of the growth versus the period of 2021, '22, but still a pretty healthy market because our patent position, especially around process was keeping generics away from the main market, North America, Europe, Brazil. ***So we were still seeing some volume growth. Dollars-wise, we saw a decrease in the number, but we've not been -- we've been very truthful about the situation.***

There is 2 type of business. There is what we call the branded business, what we sell to the market, and there is what we sell to our partners. ***What we sell to our partners are products they use for manufacturing and we sell them, make formulations. We sell them on a cost-plus basis to be prepared for the post-patent period for Rynaxypyr. We had to significantly decrease the manufacturing cost.***

***That has translated into a decrease of price to our partners. So that has decreased the overall sales in dollars.***

. . .

<Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> So there was a theory at a point in time that the global volume for these types of chemicals would increase because prices were coming down. That is prices are down probably double digits each year for the past 2 years and maybe that trend is continuing. Are you surprised that there hasn't been more volume uplift for the industry or has there been a volume uplift for the industry, but it's not been something that's touched you because of the magnitude of competitive response.

<A: Pierre R. Brondeau> There has been some volume uplift. To give you a sense, in place like Turkey or China, in the last 3 to 4 years, the size of the market tripled. ***So we have seen some volume uptick, and we are expecting significant volume uptick starting in 2026. Because to see the volume uptick you need to have a broad penetration of this market by the generics, and you need to have companies like FMC bring this product at a price, which is much lower than where we have been historically, which we can afford to do because we have a much lower cost.*** So it has been happening in some locations, Turkey, India, China, market has tripled. And we are expecting this market in volume to significantly grow in Brazil, in North America, in Latin America, we will see it, and we're seeing it.

. . .

<Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> So your view is that beginning in 2026, the volume characteristics for Rynaxypyr should be better for FMC as well as for the other competitors?

<A: Pierre R. Brondeau> Definitely. Yes, definitely you will see Rynaxypyr penetrating other markets, other insecticide market, broadening the number of applications. ***There will be a significant volume growth of Rynaxypyr starting in 2026.***

. . .

<Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> When you look at the pricing of Rynaxypyr, obviously, there are competitive responses. How predictable is the price decline for 2026 as far as you perceive it? Is it something where you think you could be right or wrong by a lot? Or is it something which is much more well defined?

<A: Pierre R. Brondeau> It's a difficult question to answer because there are going to be multiple type of Rynaxypyr. You would have low quality, very cheap products. We might not even compete with them. We're going to compete with the high end of the generics. Plus, I think we have a reputation in this market for having been making this molecule for decades of quality, and we have brands. ***So we will sell at a premium. We have some strong certainty of the pricing we need to be at, taking into account the manufacturing cost to establish our objective, to have flat earnings from '26 -- from '25 to '26 with Rynaxypyr.***

* * *

> That's the goal. '25, '26 earnings in dollars flat. ***To do that, we'll have to increase volume significantly, but we'll have to decrease price using the fact that we have decreased cost, and we'll have to participate in this expansion of the molecule. So we know where we need to be. We are pretty confident of at what price our customers will be buying our product.*** To know the range of price from our competitors, it's pretty wide and pretty hard to predict.
> . . .
> <Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> So you need a lot of volume growth to do that.
>
> <A: Pierre R. Brondeau> ***Double digit. Definitely double digit.***
>
> <A: Andrew D. Sandifer> ***But let's not forget, there's very large cost reduction here as well, right? And it's been a part of the headwind, as Pierre mentioned, on our partner business in the past year. It continues to be a headwind in '26. That's that balancing of volume price cost that allows us to get the branded business to flat dollars profitability.***

(Emphasis added).

*<u>April 29, 2026</u>*

26. On April 29, 2026, Defendants issued a press release announcing first quarter 2026 results. The press release reported that "[f]irst quarter 2026 revenue, excluding India, was $762 million, down 4 percent versus first quarter 2025, which included India" and "first quarter Adjusted EBITDA was $72 million, a decrease of 40 percent from the prior-year period, driven by lower pricing and unfavorable costs" including tariffs and raw material costs.

27. Notably, despite these challenges Defendants reaffirmed its full year 2026 financial guidance, stating in relevant part:

> ***FMC is making strong progress on its 2026 operational priorities, which are strengthening the balance sheet through targeted debt reduction of approximately $1 billion, improving the competitiveness of its core portfolio, managing the post-patent transition for Rynaxypyr® active, and driving growth of new active ingredients*** including Isoflex® active, fluindapyr and Dodhylex® active. In parallel, the Board-authorized evaluation of strategic alternatives announced in February 2026 is progressing, and multiple options are being evaluated.
>
> ***The company reaffirms its full-year 2026 revenue, Adjusted EBITDA, Adjusted EPS and free cash flow guidance ranges.***

(Emphasis added).

28. On April 30, 2026, Defendants conducted the corresponding earnings call. Defendant Brondeau acknowledged generic competition, challenges associated with Rynaxypyr's post-patent transition and cautious customer purchasing, yet reaffirmed the Company's full year 2026 guidance, stating, in pertinent part:

> FMC continues to take decisive action to optimize our manufacturing cost structure and rebuild the competitiveness of a non-diamide core portfolio in a market increasingly impacted by low-cost generic competitors. We intend to shift production from high-cost plants to lower-cost sources in Asia. We expect this transition will be completed by Q1 2027 and that will result in a more competitive core portfolio.
>
> * * *
>
> Regarding Rynaxypyr, we continue to advance our post-patent strategy with a clear focus, driving sales growth while keeping overall branded earnings that are flat. ***Our strategy is progressing, and we are seeing early signals that give us confidence.*** For example, ***we are observing positive reactions to a price repositioning with strong volume growth for high load formulations and differentiated mixtures.*** In addition, we are already seeing some small early share gains from other classes of insecticides.
>
> * * *
>
> We are still in the early stage of a post-patent Rynaxypyr market and believe that some customers are adopting a wait-and-see approach as they gauge the availability and efficacy of CTPR generic offerings. ***Our strategy will play out over the coming quarters as we implement our plan.***
>
> * * *
>
> Challenging margins and stressed liquidity for customers and growers led to cautious purchasing in most countries. Lower grower margins also increased the willingness to use generic products or skip some preventative applications. As expected, the regions with more pronounced competitive pressure were LatAm and Asia, where generics are more prevalent.
>
> * * *
>
> ***First quarter sales of $762 million were $12 million above the midpoint of the guidance, driven by better-than-expected FX and volume.*** While sales were 4% lower than prior year, sales were up 1% on a like-for-like basis after excluding India from both current and prior year periods. Sales made under the FMC brand grew 6% on a like-for-like basis and included strong volume growth in EMEA and North America in herbicides and Cyazypyr. This was mostly offset by lower sales to diamide partners.

> These partners accounted for nearly half of our overall price decline of 6%. The remaining drivers of lower price were branded Rynaxypyr price, repositioning to support our post-patent strategy and a competitive market for our legacy core products. Volume grew 2% and FX was a 5% tailwind.
>
> * * *
>
> ***We are maintaining our full year guidance despite the increased uncertainty related to tariffs and the conflict in Iran. We are beginning to see higher energy, transportation and petrochemical costs flow through to product costs. At the same time, current tariffs are lower, and there is potential to recover previously paid tariffs.***

(Emphasis added).

29. On the same call, Defendant Sandifer highlighted FMC's approximately $1 billion debt reduction target, sufficient liquidity and reaffirmed full year 2026 free cash flow guidance, stating, in relevant part:

> ***Should market conditions turn unfavorable, we have more than adequate available liquidity to redeem the maturing notes if necessary. As we move through the rest of 2026, we will use all proceeds from asset disposals, licensing agreements, real estate opportunities, et cetera, to pay down debt.***
>
> Free cash flow in the first quarter was negative $628 million, $32 million lower than the prior year period. Lower EBITDA drove a decline in cash from operations year-over-year, which was only partially offset by lower capital spending. ***We continue to expect free cash flow for 2026 to be in the range of negative $65 million to positive $65 million or breakeven at the midpoint.***

(Emphasis added).

30. During the question-and-answer segment of the call, Defendants continued to tout FMC's anticipated second-half sales improvement, driven by its core portfolio, Rynaxypyr and new active ingredients despite declining partner sales and generic competition in the following exchanges:

> <Q: Michael Joseph Sison – Wells Fargo Securities, LLC– Analyst> Pierre, you gave good detail on your second half outlook. Where do you think the biggest challenges are going to be to sort of hit that?
>
> <A: Pierre R. Brondeau> I'm going to take -- if you think about it, our forecast in H2 at the midpoint is about $425 million of sales improvement in H2 versus H1.

So I'm going to try to take the 3 main buckets allowing us to have the expectation of this $425 million increase. The first one is the non-diamide core. ***We are expecting $150 million to $200 million of improvement. And the main driver is direct sales in Brazil. As I said in our prepared comments, we already have a very significant number of orders in hand. By the middle of the year, we should have half of the orders required to deliver our H2 number in Brazil. And that is because the new sales organization is now fully in action.***

*   *   *

Number two, of the improvement, about $50 million to $80 million is Rynaxypyr. Number one driver, and we see that every year, there is nothing new to it. It's always the same sequence. ***There is significantly less partner headwind in the second half than what we see in the first half. We also have a stronger branded performance in the second half.***

And the last one, the third one, maybe the most important is our ***new active ingredients, which are accounting for about $175 million to $200 million, mostly LatAm, North America, but also remember, the cereal season in EMEA in Great Britain, where we sell Isoflex is in the third quarter.***

*   *   *

So Mike, that's about the -- as precisely as I can do of a bridge with much higher level of confidence in each of those 3 buckets with what we are seeing right now.

. . .

<Q: Patrick Duffy Fischer – Goldman Sachs Group, Inc.– Research Analyst> So a question on Rynaxypyr and in particular, the partner sales. I think you've talked about that being $200 million in revenue, which for the company would, let's say, be 5% or 6% of total sales. But last year in Q1, your price was down 9%. You called out partner sales as being half of that. You also called out this Q1 partner sales being half of your price decline of 6%.

So it seems like collectively, on a 2-year stack, that's been like 7% of total company sales price down on something that's like only 6% or 7% of the company's sales. So the math doesn't triangulate for me at least. So can you talk about how big was that partner sales at the peak? How big is it on the run rate today? And roughly how much is the price fallen for partner sales in particular?

<A: Pierre R. Brondeau> Yes. I'm trying to reconcile those numbers, especially using '25 to '26, that's the easiest comparison. First, in '25 versus '24, remember, that's where we had the highest price drop because that is the time when we had the highest cost reduction in the manufacturing of Rynaxypyr. So we are still seeing an impact as we continue to lower price, but less in '26 than it was in '25.

*   *   *

***If we look at 2026, we are forecasting $700 million of Rynaxypyr sales. That will be $600 million of branded Rynaxypyr, flat number versus '25, but partner sales decreasing to a number lower than $100 million.*** So as you can see, partner sales because of price and also volume are going to be accounting in '26 for less than half of what it was last year.

> ***We believe that is a trend we're going to keep on seeing. At this point, the partner sales of $100 million going down next year, is going to be a very small part of our company. And regarding the branded sales, I think we believe that earnings for this year will be similar to prior year on similar sales.***
> . . .
> <Q: Matthew Porter DeYoe – Bank of America Securities– Research Analyst> What drives the variance around the success of that 2H? Is it the same mix shift? Is there a risk that the price premium you have on the lower end doesn't hold up in Brazil? Like how do we gauge the upside, downside of what this 2H might look like for Rynaxypyr?
>
> <A: Pierre R. Brondeau> Regarding Rynaxypyr, I think whether it's Brazil or North America in H2, all the strategy to be fully successful, ***I think the #1 criteria is how we are going to be performing in growing the percentage of sales on the high-end part, which is higher the high concentration or the mixtures and positioning them at the right price to still be competitive.*** The reason for that is because Rynaxypyr has been on the market for a while, there is resistance very much in China, starting to be significant in Latin America. Those formulations very often help positioning the product and address the resistance issue or the efficacy issue.
>
> ***So I'd say a significant part of our strategy and maybe in H2, more important than the gain of volume against generic with a single is that piece, succeeding in growing as much as we can the high-end part of our portfolio, which we are selling at a premium.***
>
> * * *
>
> ***Also because the patent just ran out at the end of '25, generics are starting to be active in some countries like Brazil, North America,*** but let's face it, they will be more active in Q3, Q4 than they were in Q1. So the real test is in the second half of the year.

(Emphasis added).

*<u>May 14, 2026</u>*

31. On May 14, 2026, Defendants presented at the 21st Annual Global Farm to Market Conference. During the question-and-answer portion of the conference, Defendants acknowledged weakness in FMC's core portfolio and competitive pressures, yet reiterated that cost reductions and strategic initiatives would restore competitiveness and drive future growth in the following exchanges:

> <Q: Joel Jackson – BMO Capital Markets – Senior Analyst> [W]e've seen core contract a bit for different reasons. We've seen the growth part of the portfolio, be

kind of flattish. What -- in each part core, what's the main thing you got to see happen to be able to get to at least flat and for growth?

<A: Pierre R. Brondeau> The problem we have is we are not capable of deploying a formulation technology because the active ingredients we are using for that are too expensive. ***Overall, we are manufacturing at a cost which is not competitive on the market and prevent us to have this core competency in place.***

***I am convinced that by the middle of 2027, once we have a core portfolio, competitive with generics on cost, and then we're able to deploy our formulation technology, we will grow faster than the market.*** I mean if the market grow 2%, 3%, we should be able to expect 3%, 4% growth for this part. And that's very critical because you can do whatever you want. When half of your company is going down 4% or 5% a year, it doesn't work. We need to get that back to a 4% growth rate, and I believe we're going to start to see that in '27.

. . .

<Q: Joel Jackson – BMO Capital Markets – Senior Analyst> Do you think you're reversing your trough, your FMC trough this year? Or might it be in '27?

<A: Pierre R. Brondeau> No. ***This year. This year is a year where we need to execute on the 4 pillars of the strategy and reset the financing of the company.*** And I believe if we execute all of these, we'll be in the position in '27 to see growth.

. . .

<Q: Joel Jackson – BMO Capital Markets – Senior Analyst> [W]hat do you think investors are missing the most about FMC these days?

<A: Pierre R. Brondeau> The problem FMC has is, to say the least, the last 3 or 4 years results were not spectacular. Consequently, when you're in a situation like this one, the normal reaction of investors, and I would do exactly the same thing, is to look at what will this company do in the next 6 to 12 months because we've got to prove what we say we're going to do. So maybe what investors are missing because of that situation is the potential I described before, if we succeed with our delivery of the 2026 plan as designed, start back to growth in '27, past '27, we are going to have an incredible portfolio.

(Emphasis added).

*June 17, 2026*

32. On June 17, 2026, Defendants presented at the 3rd Annual Materials of the Future Conference. During the question-and-answer portion of the conference, Defendant Brondeau noted he saw no reason to change FMC's previously announced full year financial outlook despite ongoing pricing pressures in the following exchange:

<Q: Christopher S. Parkinson – Wolfe Research, LLC – Senior Analyst> How are you thinking about your order book for the second half.

<A: Pierre R. Brondeau> So we have not yet been through the formal process of doing the full year forecast. ***I would just say, at this stage, I have not seen anything which would make me reconsider a full year target as we stated it so far…But what I see at this stage, not formally, but I don't see any reason to change the full year.***

. . .

<Q: Christopher S. Parkinson – Wolfe Research, LLC – Senior Analyst> But when you look at the data out of Asia for base molecules that have been off for decades, for the first time in years, it does appear as if pricing is beginning to stabilize…At the same time, you look at the Asian exports and a bit of a lag but the Asian exports to Latin America in particular appear to be, I wouldn't say going down but plateauing for the first time in a few years…Am I looking at the wrong data as far as the preliminary indicator for the second half? Or is it -- we just don't want to get ahead of ourselves? Or how are you thinking about that? And are you seeing -- beginning to see some of the similar things?

<A: Pierre R. Brondeau> There is indications that there is stabilization of pricing in Latin America at this stage coming from generics, but we are seeing it more on the nonselective herbicide like 2,4-D and glyphosate more than you see it on the selective herbicide or other products. So there is some signal of stabilization of pricing, but I want to be prudent because we don't see it yet in a product line, which were maybe a bit more technical than the nonselective products.

* * *

***We've been too surprised over the last 3 years, always expecting things are going to turn and they didn't turn. So I'd rather prepare myself to compete in a tough pricing situation and be pleasantly surprised than starting to act like this is going to happen and then it doesn't happen.***

. . .

<Q: Christopher S. Parkinson – Wolfe Research, LLC – Senior Analyst> [C]ould you just give before we wrap up an update on free cash flow. It seems like it's basically neutral. What are the puts -- obviously, the things that is going to be contingent on the second half. And Andrew, perhaps if you could just hit on kind of the puts and takes what you're monitoring? And as of today, if this was the starting point, do you feel better than you did on January 1?

<A: Andrew D. Sandifer> As always, a big dynamic in our working capital just -- our working capital is a big dynamic in our free cash flow. It's a competitive environment. Many of the parts of the world we're in, in Brazil, particularly the strong growth that's longer term. ***So we're doing a lot of things to try to manage that working capital, both from receivables and an inventory perspective. So we'll have more to say in July, but I think certainly, that band around breakeven free cash flow this year is the right place.***

(Emphasis added).

<u>*July 29, 2026*</u>

33. On July 29, 2026, Defendants issued a press release announcing second quarter 2026 results. The press release reported that due to "lower diamide partner orders and reduced demand for legacy products" the Company was revising its full-year 2026 revenue guidance range to "$3.50 billion to $3.70 billion" and "[a]djusted EBITDA is expected to be $620 million to $680 million." Despite these challenges, Defendant Brondeau remained confident in FMC's business strategy, touting actions taken during the quarter to "strengthen FMC's financial foundation and provide greater flexibility to execute" the Company's strategy, stating in pertinent part:

> ***With the strategic review now concluded, we have clarity on the path forward and remain focused on improving competitiveness, advancing our technology portfolio and positioning the company for long-term growth.***

(Emphasis added).

34. On July 30, 2026, Defendants conducted the corresponding earnings call. Defendant Brondeau acknowledged the challenging market conditions and operating headwinds but continued to express confidence in FMC's strategy to improve cost competitiveness and growth in advanced Rynanxpyr products, stating, in relevant part as follows:

> As previously announced, our objective is to exit active ingredients and formulation production assets that are no longer cost competitive and transition production toward -- to lower-cost sources. While this work remains underway, we are increasingly confident in the value it will deliver. ***In addition, we have made meaningful progress in realigning our supply chain and are beginning to see benefits from those efforts.***
>
> * * *
>
> We remain focused on executing our post-patent strategy for Rynaxypyr. ***We continue to see strong demand for our differentiated formulations and mixtures. Sales of these products grew more than 35% year-over-year during the second quarter. We also remain focused on volume growth outpacing lower pricing as the market evolves.*** Despite increased generic competition, branded diamide sales, excluding India, were essentially flat year-over-year. ***Over time, we expect branded diamide to grow in revenue as pricing stabilizes and we continue to take market share from other classes of insecticides. We are already seeing encouraging signs***

> ***of volume growth. In the second quarter, we saw very strong gains in hectares treated in key countries like Brazil, where product-on-the-ground usage is up over 40%. These results reinforce our confidence in our post-patent strategy.***
>
> * * *
>
> Our second quarter revenue of $841 million, excluding India, was 1% lower than the low end of our guidance range. As we forecasted, there were reduced orders from diamide partners as well as expected registration losses in EMEA. However, we encountered additional volume headwinds in North America as strained margins drove careful purchasing behavior for growers of non-specialty crops. Excessive heat in EMEA also led to lower-than-expected demand. ***We saw strong volume growth in new Rynaxypyr formulations, particularly in Brazil and North America.***
>
> New actives showed good growth, but we do not expect the bulk of the year-on-year increase to occur until the fourth quarter when fluindapyr in LatAm and North America as well as Isoflex in Australia will be in higher demand. Second quarter pricing was down slightly more than our mid-single-digit expectation due to greater-than-expected pressure on core legacy products. Similar to prior quarters, there was more pronounced pricing pressure in LatAm and, to a lesser degree, Asia. New active ingredients and Cyazypyr delivered solid growth during the quarter, contributing to higher sales from our growth portfolio.

(Emphasis added).

35. On the same call, Defendant Sandifer expressed confidence that FMC's strategic initiatives were "greatly strengthening the financial foundation of the company" stating, in relevant part, as follows:

> We intend to pursue additional opportunities to license molecules from our portfolio and to enter collaborations that allow us to share the cost of developing earlier-stage active ingredients. ***The reality is that our pipeline contains more high-quality active ingredients than we can fund and develop in a timely manner on our own.*** As a result, partnerships such as our licensing agreements with Corteva for rimisoxafen and fluindapyr and with Bayer for Isoflex active, as well as future co-development arrangements, are becoming an increasingly important part of our operating model. These collaborations help accelerate the development and commercialization of new technologies, while also providing a meaningful source of operating cash generation.
>
> Beyond the prepayment from Corteva, free cash flow in the second quarter also benefited from lower receivables overall, with strong collections in Asia, including India, and in EMEA as well as lower cash taxes. ***We are updating our 2026 free cash flow outlook to reflect both the updated EBITDA outlook and the Corteva prepayment. We now expect free cash flow to be in the range of $75 million to***

> ***$225 million, or $150 million at the midpoint. Our free cash flow guidance also includes approximately $170 million in expected cash spending on restructuring, driven largely by the significant reshaping of our manufacturing and supply network that is underway.*** Free cash flow, excluding restructuring, would be approximately $320 million in 2026 at the guidance midpoint. While we do expect to have meaningful continued cash spending on restructuring in 2027, this should dramatically reduce in 2028 and beyond, greatly improving our free cash flow generation.

(Emphasis added).

36. During the question-and-answer segment of the call, Defendants characterized FMC's challenges as temporary and expressed confidence that new product growth and inventory reductions would drive growth and improve financial performance in the following exchanges:

> <Q: Patrick Duffy Fischer – Goldman Sachs Group – Analyst> First question is just around the ramp from your Q3 midpoint to your Q4 midpoint, kind of $165 million of improvement. Can you walk through sequentially what those buckets are?
>
> <A: Pierre R. Brondeau> Three big drivers on the positive front. First, the non-diamide core, and that includes the growth, of course, in direct sales in Brazil. ***We're expecting this to be about $150 million. The new active ingredients, we believe with the number we see now forecasting, it's going to be from Q3 to Q4, about $70 million.*** And then you have others, including brand Rynaxypyr, especially in Latin America, in the range of $40 million.
>
> . . .
>
> <Q: Edlain S. Rodriguez – Mizuho Securities USA – Director> The question is, with the things you can control, like when do you think we will start to see the benefits of the work you are doing? And essentially, like how does the patient get better going forward?
>
> <A: Pierre R. Brondeau> As we look at it, we have all the reasons in the world to believe that 2026 is the trough. ***We believe the worst is behind us with the loss of IP protection on Rynaxypyr. And for Rynaxypyr, all signs are pointing to us being able to protect Rynaxypyr earnings in '27.***
>
> First, let's talk about our biggest issue in 2026. This is a $2.1 billion non-diamide core business, and that business is down this year or should be down when we close the year by about 5%. With all the work we are doing on a global manufacturing footprint, we should be competitive again and back to growth as soon as next year.

> On bucket number two is our new active ingredients. The growth should be accelerating to a minimum of 50% to 70% as we are gaining more and more registration.
> . . .
> <Q: Joel Jackson – BMO Capital Markets – MD & Senior Analyst> Pierre, when you did all the actions over the last bunch of months, and you were aggressive, you did a lot of things. It seemed like you thought you could do kind of hold earnings around $700 million EBITDA with the free cash flow around that. You've come down a little bit lower this year, leverage a little bit higher than maybe what you would have thought.
>
> <A: Andrew D. Sandifer> From a cash from operations perspective, net-net, we moved the guidance midpoint up $85 million. That's about $200 million from the rimisoxafen deal. So obviously, some headwinds hitting against that, certainly the biggest being the lower EBITDA expectation. We also have some higher restructuring spending as we're accelerating some of our actions to improve our manufacturing network. We do see a little less improvement in working capital this year because of the sales shift from Q3 to Q4, and there's a few other minor drags as well.
>
> But we have more work to do on improving working capital as we continue to get into a better rhythm with our production cadence, as we continue to drive a more aggressive collection of receivables, and improving overall credit quality of the portfolio. ***So I think you'll see this year some good improvement in inventory reduction as we get through the year, more work to do on receivables and payables as we go into 2027.***
>
> <A: Pierre R. Brondeau> ***You will see this year, it's something we fully control, it's inventory, and we do have strong expectation that we're going to make some very significant progress on the inventory situation. We are monitoring that very closely, and all indicators are pointing to a strong progress.***

(Emphasis added).

37. The above statements in Paragraphs 20 to 36 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected 2026 financial outlook and anticipated recovery, based on projected growth in its core portfolio, Rynaxypyr and new active ingredients, as well as manufacturing cost reductions and improved inventory management. In truth, the Company was seeing a significant distributor inventory problem, in which elevated-priced inventory held by

distributors was difficult to sell thereby impairing replenishment orders across FMC's portfolio and threatening the Company's ability to generate new sales, revenue, EBITDA and cash flow, making FMC's full year 2026 financial outlook unlikely to be met. Defendants misled investors by providing the public with materially flawed statements of confidence cost savings and growth projections which did not account for these variables.

***The Truth Emerges in FMC's Preliminary Third Quarter Earnings Report***

*October 15, 2026*

38. On October 15, 2026, Defendants published a release announcing preliminary third quarter 2026 results that fell materially below expectations and accordingly revised revenue estimates "to be between $65 million and $125 million with expected Adjusted EBITDA of negative $565 million to negative $510 million," stating as follows:

> The critical commercial issue facing FMC is slower-than-expected demand from channel customers in key markets. Under current market conditions, distributors are seeking to operate with the lowest inventory levels FMC has experienced. Although the company made meaningful progress reducing channel inventory volumes in 2025, ***certain higher-priced FMC products are increasing the overall value of FMC inventory held by some customers. These products entered the channel under different cost structures, intellectual property positions and competitive conditions. Rapid market price declines, driven in part by increased generic competition, have widened the gap between the value of affected inventory and current market prices, limiting movement of those products to growers.***

(Emphasis added).

39. As part of the same release, Defendant Brondeau blamed weaker-than-expected third quarter demand on "challenging market conditions and elevated levels of higher-priced FMC products held in inventory by certain channel customers." Notably, Defendant Brondeau further admitted that "[w]e have addressed this issue incrementally over several quarters, but under current market conditions, we determined that more comprehensive actions are necessary."

40. On October 29, 2026, FMC reported its actual third quarter 2026 financial results revealing a "$639 million negative impact from the commercial actions announced on October 15, 2026" to address elevated channel inventory and modify its North American pricing and rebate model. Defendant Brondeau acknowledged that the actions were necessary to address "elevated inventory values in the channel" and that results also reflected "weaker than expected demand." FMC further slashed its full-year 2026 outlook, projecting revenue of $2.75 billion to $2.85 billion, adjusted EBITDA of negative $124 million to negative $104 million, and adjusted EPS of negative $3.66 to negative $3.50.

41. During the corresponding earnings call held on October 30, 2026, Defendant Brondeau acknowledged that the channel inventory problem was constraining FMC's business and management was forced to undertake more comprehensive corrective actions, stating in relevant part:

> ***Through the early part of September, third quarter performance was tracking broadly in line. However, during the final weeks of the quarter, channel customers in several key markets sharply reduced replenishment orders as they thought to close the season with lower inventory levels.***
>
> * * *
>
> We have spent the past several years making significant changes to the company. We have lowered costs, change our manufacturing footprint, generated significant proceeds to support our balance sheet and advanced new products to market allowing this inventory issue to continue constraining the business will limit our ability to fully realize the benefits of that work.
>
> ***Therefore, we have decided to address the issue more comprehensively now.*** The faster products move downstream to growers, the quicker we can start to realize the benefit of our current competitive pricing. Moreover, the manufacturing changes underway across our legacy portfolio are expected to further improve our cost position and our ability to compete. While the final impact of these actions is reflected in the third quarter results implementation is just beginning.

(Emphasis added).

42. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 25, 2025, March 18, 2026, May 14, 2026, and June 17, 2026 Industry Investor Day calls; the February 5, 2026, April 30, 2026 and July 30, 2026 earnings and shareholder calls. On those calls, Defendants continually touted FMC's anticipated sales growth from its core portfolio, branded Rynaxypyr, and new active ingredients, expressed confidence in manufacturing cost reductions and improved operational efficiency, and maintained their 2026 financial outlook, while minimizing the severity of distributor-inventory problems and describing weaker customer orders as temporary shifts in purchasing and inventory levels as temporary slowdowns related to timing and inventory management.

43. Investors and analysts reacted immediately to FMC's revelation. The price of FMC's common stock declined from a closing market price of $8.09 per share on October 14, 2026, FMC's stock price fell to $5.62 per share on October 15, 2026, a decline of about 31%.

44. A number of well-known analysts who had been following FMC lowered their price targets in response to FMC'S disclosures. For example, Mizuho Securities lowered its price target to $10.00 from $12.00 noting that, "[t]he key question for investors and for us is whether this final reset is sufficient to turn the ship and better position the company…[w]e believe that management has already tried almost everything and this is probably the last lever to pull."

45. J.P. Morgan analyst maintained its underweight rating describing FMC's third quarter results as "tough" and commenting, "[r]ebate mechanics may provide an optical balance sheet benefit into 2027, but distributor order replenishment and sell-through will provide a more realistic assessment regarding channel dynamics."

46. UBS analyst cut its price target from $10.00 to $6.50, noting, "we see a high degree of uncertainty in the outlook around 1) whether the pricing floor on the core off-patent portfolio and diamides has been reached given continuing competitive pressures, 2) whether FMC will be able to deliver manufacturing cost reductions needed to earn a reasonable margin on these products at a competitive price point."

47. The fact that these analysts, and others discussed FMC'S financial shortfall and reduced revenue projections suggests the public placed significant weight on FMC's prior financial and growth estimates. The frequent, in-depth discussion of FMC'S shortfall confirms that Defendants' statements during the Class Period were material.

***Additional Scienter Allegations***

48. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of FMC were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the Company's distributor inventory problems, specifically the elevated priced inventory held by distributors, the resulting constraints on replenishment orders and impact on FMC's sales, revenue, EBITDA and cash flow projections.

49. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that FMC's strategic initiatives, manufacturing cost reductions and anticipated volume growth would improve the Company's competitiveness and financial performance, while characterizing weaker distributor orders and volume fluctuations as temporary shifts related timing and inventory management and that the Company remained on track to achieve its 2026 financial outlook.

50. Defendants' scienter was further evidenced by their repeated claims of confidence that FMC's core portfolio volume growth would improve despite their knowledge of the distributor inventory issues. Defendants continued to characterize this issue as temporary and addressed it incrementally while failing to disclose the need for a major pricing reset and the extent that these conditions were impairing the Company's financial outlook.

***Loss Causation and Economic Loss***

51. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of FMC's common stock and operated as a fraud or deceit on Class Period purchasers of FMC's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of FMC's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of FMC's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

52. FMC's stock price fell in response to the corrective event on October 14, 2026, as alleged *supra*. On October 14, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning the Company's 2026 financial outlook and the true state of its distributor inventory problems.

53. In particular, on October 14, 2026, FMC announced preliminary third quarter 2026 results that fell significantly below expectations, including an approximately $625 - $675 million negative impact from commercial actions to address elevated priced distributor inventory. FMC

further projected revenue "to be $65 million to $125 million, with Adjusted EBITDA expected to be negative $565 million to negative $510 million."

***Presumption of Reliance; Fraud-On-The-Market***

54. At all relevant times, the market for FMC's common stock was an efficient market for the following reasons, among others:

(a) FMC's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b) FMC communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) FMC was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about FMC was reflected in and incorporated into the Company's stock price during the Class Period.

55. As a result of the foregoing, the market for FMC's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in FMC's stock price. Under these circumstances, all purchasers of FMC's common stock during the Class Period suffered similar injury through their purchase of FMC's common stock at artificially inflated prices, and a presumption of reliance applies.

56. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

***No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine***

57. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with earnings projections while at the same time failing to maintain adequate forecasting processes or otherwise publicly disclose known adverse conditions of its distributor inventory problems. Defendants provided the public with forecasts that failed to account for elevated priced products held in distributor inventory and constrained product movement and replenishment orders across FMC's portfolio.

58. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

59. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was

authorized and/or approved by an executive officer of FMC who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired FMC's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

61. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FMC's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of September 30, 2026, there were 155.5 million shares of the

Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

62. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FMC;

(c) whether the Individual Defendants caused FMC to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of FMC's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

66. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FMC common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire FMC's

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for FMC's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

70. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of FMC's internal affairs.

72. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to FMC's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of FMC's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired FMC's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

73. During the Class Period, FMC's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of FMC's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of FMC's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of FMC's common stock

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

76. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about FMC's misstatements.

78. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by FMC which had become materially false or misleading.

79. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which FMC disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause FMC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were “controlling persons” of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FMC’s common stock.

80. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause FMC to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81. By reason of the above conduct, the Individual Defendants and/or FMC are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys’ fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: November 19, 2026

Respectfully submitted,

**PRIBANIC & PRIBANIC, LLC**

*/s/ Vincent A. Coppola*
Vincent A. Coppola, Esq.
Penn. Attorney #50181
513 Court Place
Pittsburgh, PA 15219
Tel: (412) 281-8844
Fax: (412) 281-4740
Email: vcoppola@pribanic.com

-and-

**LEVI & KORSINSKY LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff Alessandro Godeas*